# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ALEX DENTICE,

       Plaintiff,

    v.                            Case No. 10-C-113

FARMERS INSURANCE EXCHANGE,

       Defendant.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S SUMMARY JUDGMENT MOTION

## I. PROCEDURAL BACKGROUND

This action was commenced on February 9, 2010, when the plaintiff, Alex Dentice ("Dentice"), filed a complaint in the United States District Court for the Eastern District of Wisconsin pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et. seq.*, and the Americans with Disabilities Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008). Dentice filed a complaint against Farmers Insurance Exchange ("Farmers"), alleging that Farmers discriminated against him on the basis of his disability, that Farmers failed to accommodate his disability, and that Farmers retaliated against him by terminating his employment.

This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2617(a), and venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391. All parties have consented to the exercise of jurisdiction by a magistrate judge. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73(b)(1).

This matter is now before the court on the defendant's motion for summary judgment, which was filed on July 22, 2011. On August 19, 2011, Dentice filed a response in opposition to the

defendant's motion, arguing that its motion should be denied because it failed to file its proposed findings of undisputed fact as required by Civil L.R. 56(B)(1)(C). On that same date, August 19, 2011, Dentice filed a flurry of Civil L.R. 7(h) expedited non-dispositive motions relating to discovery. On August 24, 2011, the court stayed further briefing on the defendant's motion for summary judgment pending further order of the court. After the court conducted a scheduling conference on September 7, 2011, at which time it addressed Dentice's non-dispositive motions, allowed some additional discovery, and granted the defendant's Motion to File its Statement of Facts *Instanter*, briefing of the defendant's summary judgment motion resumed. Dentice filed his opposition brief on November 18, 2011 in accordance with the court's Text Only Order granting him additional time to file his response brief. Farmers moved the court for an extension of time to file its reply, which was granted, and thereafter filed its reply on December 16, 2011, thus concluding the briefing on its motion. For the reasons that follow, the defendant's motion for summary judgment will be granted in part and denied in part.

## II. FACTUAL BACKGROUND[1]

Dentice began working for Farmers on March 16, 1981. (Defendant's Proposed Findings of Fact ("DPFOF") ¶ 3.) Before January 2009, Dentice was a Litigation Attorney Claims Representative,

---

[1] On November 14, 2011, in response to Farmers' motion for summary judgment, Dentice moved the court to permit him to file statements of additional facts in excess of the 100 permitted by the local rules. In his motion, Dentice did not specify how many statements of additional facts he wished to file, and therefore, the court limited him to 150 statements of additional facts. This order granting in part and denying in part his motion was met with a motion for reconsideration, wherein Dentice requested that the court permit him to file 386 statements of additional facts, which he included in an appendix to his motion. The court granted Dentice's motion for reconsideration.

A review of Dentice's statements of additional facts reveals that many of his proposed facts are not "additional"; rather, they merely repeat Farmers' statements of fact. Indeed, Dentice supports his "additional" facts by referencing Farmers' statement of proposed material facts. Such inclusion of facts that Farmers proposed and that Dentice did not dispute in his response is repetitive, unnecessary, and contrary to Civ. L.R. 56. The court will therefore disregard Dentice's repetitive statements of fact.

which involved the same type of work as a Direct Claims Representative as well as selecting outside counsel and working on the attorney-represented insured claims through litigation.  (DPFOF ¶ 7.)

In the fall of 2007, Farmers implemented some changes that affected Dentice.  At that time, Farmers nationally implemented objective, uniform performance standards known as "total file quality" ("TFQ") in an effort to monitor the outcome of the claims files in conjunction with the performance of claims representatives by conducting audits of those file on a continuous audit cycle.  (DPFOF ¶ 13.)   Additionally, in October 2007, Maggie Ackman ("Ackman") became acting supervisor over the Milwaukee Branch Claims Office ("BCO"), and, in January 2008, she formally took over as Dentice's supervisor.  (DPFOF ¶ 9.)  Ackman works out of Minneapolis, but in an effort to meet and engage with her direct reports, she traveled to the Milwaukee BCO at least once a month.  (DPFOF ¶ 11.)  Ackman reported to Branch Claims Manager Brent Golden ("Golden"), who worked in the Milwaukee BCO.  Golden reported to Randy Goetz ("Goetz"), the Regional Claims Manager.  (DPFOF ¶ 10.)

According to Dentice, Farmers did not enforce TFQ scores in the Milwaukee BCO until January 2008.  (Pl.'s Resp. to DPFOF ¶ 14.)  On April 25, 2008, Golden emailed Goetz, indicating that Farmers was going to be placing four employees, including Dentice, on progressive discipline with the issuance of a formal counseling memorandum based on poor performance.  (DPFOF ¶ 17.)[2] On April 28, 2008, Golden issued Dentice a "Formal Counseling Memo-Performance," dated April 23, 2008, placing him on performance counseling due to Dentice's low TFQ scores and his overall need for improved performance.  (DPFOF ¶¶ 17, 20.)  On that same day, April 28, 2008, Dentice

---

[2]  Farmers also placed Al Dentice, Roni Winchell, and Stacy Glendenning on progressive discipline.  (DPFOF ¶ 18.)

visited his physician in the afternoon and advised Ackman that same evening that he "will not be able to work for some time as my doctor has put me on a medical leave." (DPFOF ¶ 21.)

While on a medical leave of absence, Dentice was diagnosed with depression, general anxiety disorder, and panic disorder. (Plaintiff's Proposed Findings of Fact ("PPFOF") ¶ 73.) According to Dentice, he experienced daily panic attacks, lack of concentration, difficulty sleeping, weight loss, change in his blood sugar levels, and crying fits. He stopped interacting with his family, he stopped performing tasks around the house, and his marital relations suffered.[3] Dentice was prescribed Alprazolam for his anxiety, Citalopram for depression, sleeping medication, and medication for his diabetes. (PPFOF ¶ 74.) Dentice directly attributed his anxiety and depression to "job stress and a change in philosophy at work," as well as from having a new supervisor. (DPFOF ¶ 91.) While Dentice's anxiety caused him to worry about his job and it took longer to do his job, it did not affect his ability to interact with customers, supervisors, or co-workers, and he was able to give a "good day's work for a good day's pay." (DPFOF ¶ 93.)

Dentice was also diagnosed with carpal tunnel, although he does not recall when. (Pl.'s Resp. to DPFOF ¶ 94.) It began five or six years ago when his hands started falling asleep at night, and he was prescribed hand braces to wear at night. Dentice was also experiencing a tendonitis problem where lumps would form on his wrists and his wrists would swell. (Pl.'s Resp. to DPFOF ¶ 94.) Dentice testified that, after an hour of typing, his wrist would swell and his fingers would not move. (PPFOF ¶ 169.) Dentice first told Farmers about his carpal tunnel upon his return to work following his medical leave. (DPFOF ¶ 94.) While Dentice does not have "limited typing skills," Dentice

_____

[3] Dentice testified that his diabetes, not his depression or anxiety, impacted his "relations with [his] wife." (Dentice Dep. 138-40, Jan. 18, 2011, ECF No. 25.)

4

testified that the carpal tunnel causes him anxiety because he had to type a significant amount and his condition impeded completion of his typing in a timely manner. (PPFOF ¶ 170.)

Dentice also suffers from diabetes, but he never advised anyone at Farmers of his condition and never requested to be accommodated on account of his diabetes. (DPFOF ¶ 98.)

During his leave of absence, Dentice responded to two inquiries from his supervisor regarding his return to work. (DPFOF ¶ 99.) Dentice never talked with Golden, Ackman, or Goetz regarding his need for a leave of absence; he communicated only with Farmers' third-party administrator, Liberty Mutual, and Farmers' Human Resources Specialist Tim Groby ("Groby") regarding the status of his leave of absence. (DPFOF ¶¶ 100-01.) The parties dispute whether Ackman, Golden, or Goetz knew why Dentice took his medical leave of absence. (DPFOF ¶¶ 23, 101; Pl.'s Resp. to DPFOF ¶ 23.)

In the fall of 2008, Dentice applied for disability retirement. (PPFOF ¶ 113.) Dentice described his condition as "depression, emotional distress." (PPFOF ¶ 115.) Dentice's doctor, Dr. Shaffer, stated that he had been "severely impaired by panic associated with work situation," and that as his treating physician he "did not anticipate [Plaintiff] will be able to return to his previous employment." (DPFOF ¶ 103.) Dr. Shaffer also indicated that Dentice was unable to engage in stressful situations or engage in interpersonal relations, and that Dentice was totally and permanently disabled. (PPFOF ¶ 119.) On January 6, 2009, Farmers denied Dentice's application for disability retirement. (DPFOF ¶ 104.)

On January 9, 2009, Dentice told Farmers that he intended to return to work. (DPFOF ¶ 24.) In preparation for his return to work, Dentice checked himself into Aurora Psychiatric Hospital and received one week of out-patient treatment for his anxiety and depression. (PPFOF ¶ 127.) On January 17, 2009, Dentice provided Farmers with a response to his April 28, 2008 performance

counseling memo, in which he stated that "[o]ver the past nine months there have been several changes and implementations in the way that we do our everyday job." (DPFOF ¶ 106; Def.'s App. Ex. 7, ECF No. 25.) Dentice provided Farmers with a letter from Mr. Robert Riegert, Lead Psychotherapist at Aurora Health Center, and Dr. Deeken, his psychiatrist, which included recommendations for a successful return back to work. Dentice also indicated that he would need the following in order to be successful in his return back to work: (1) an extended period of training; (2) work with a supervisor locally and "seek direction and training face-to-face on a daily basis to obtain my goals of success"; (3) to be taken off of formal counseling; and (4) the recommendations of Mr. Riegert and Dr. Deeken, which included a voice recognition software program. (DPFOF ¶¶ 106-07; Def.'s App. Ex. 7, ECF No. 25.) Mr. Riegert wrote the following:

> Part of Mr. Dentice's anxiety about returning to work is related to his limited typing skills. This leads to falling behind in his paperwork, which adds to his stress and anxiety. When brainstorming ways to address this, we wondered if some kind of voice-activated typing program could be made available to him? The reduced anxiety that he would be under would likely translate into a greater likelihood of a successful return as well as a more productive employee.

(Def.'s App. Ex. 6, ECF No. 25.) Upon receiving Dentice's January 17, 2009 counseling "response," Groby began working with his manager, Jacquelyn Lee-Stevens ("Lee-Stevens") regarding what accommodations Farmers could provide to Dentice. (DPFOF ¶ 108.) It is undisputed that in January 2009, Dentice informed Ackman that he had carpal tunnel syndrome. (DPFOF ¶ 52; Pl.'s Resp. to DPFOF ¶ 52.)

On January 19, 2009, Golden emailed Goetz, stating that Golden will have Dentice "work out of the office everyday, so that a member of management (Greg [Pauscha] and myself) is available to address the daily face to face feedback that he is requesting." (DPFOF ¶ 36.) On January 22, 2009, Golden emailed Ackman a plan for Dentice's first week back at work—January 26, 2009 through January 30, 2009. (DPFOF ¶ 31; Def.'s App. Ex. 8, ECF No. 25.) On Monday, January 26, 2009,

Ackman was supposed to discuss with Dentice his responsibilities as a Direct Field Claims Representative as well as the requirement that he work in the Milwaukee office except when he is on an in-person contact ("IPC") or completing a field investigation. (Def.'s App. Ex. 8, ECF No. 25.)

Farmers intended Dentice to work from the office when not in the field because of his request for an accommodation and because of his performance. (Ackman Dep. 217:21-218:16, Jan. 19, 2011, ECF No. 25.) Before his leave of absence, Dentice had worked out of his home. (DPFOF ¶ 32.) However, Dentice was not the first employee not able to work out of his home. In 2008, Tim Kuckuk and Mary Korinko were not able to work from home due to performance issues, and Tricia Kantack did not work from home because she was newer and needed some additional guidance and assistance. (Golden Dep. 53:13-54:8, May 11, 2011, ECF No. 25.)

Ackman testified that, on January 26, 2009, she spoke with Dentice via the phone and walked him through his return to work plan. (DPFOF ¶ 37.) Although Ackman did not give a copy of the return to work plan to Dentice, her notes reflect that she told Dentice of Farmers' expectation that he was to work from the Milwaukee BCO when he was not on an IPC or completing a field investigation. (DPFOF ¶ 38.) Ackman testified that later that afternoon, around approximately 1:00 p.m., she received a phone call from Dentice from his home, and she instructed him get back to the office. (DPFOF ¶ 40.)

Dentice denies that he was told, in January 2009, to work from the office every day except when in the field. (DPFOF ¶ 39.) Dentice indicates that he was never informed that he was required to work out of the Milwaukee office as opposed to his home once he was on a full rotation of assignments. (PPFOF ¶ 187.) According to Dentice, he began working from home after his first week of training and review in the office. (PPFOF ¶ 191.)

However, Golden testified that Dentice worked from the office most days and chose to sit in the same desk location when he was in the office.  (DPFOF ¶ 43.)  Golden also informed Ackman that Dentice was following her direction to work from the office.  (DPFOF ¶ 46.)  Moreover, according to the declarations of two of Dentice's former coworkers, Karen Klamerus and Sandra Dobrient, Dentice told them that he was told to work out of the office every day except when he was out of the office for an IPC or performing field work.  (DPFOF ¶ 44; Klamerus Decl. ¶ 8; Dobriant Decl. ¶ 8.)[4] Dentice denies telling this to his two coworkers.  (Pl.'s Resp. DPFOF ¶ 44.)

Dentice remained on a leave of absence until January 26, 2009.  (DPFOF ¶ 22.)  Upon his return to work, Dentice did not return as a litigation claims representative.  Rather, Dentice assumed the position of Direct Field Claims Representative.  (DPFOF ¶ 26.)  Farmers did not initially return him to "formal counseling" status.  (DPFOF ¶ 60.)  Groby testified that Golden asked him whether Farmers "should put the counseling back in place immediately" upon Dentice's return, to which Groby advised that Dentice should not be put back on counseling to allow for a re-training period. (Groby Dep. 159:20-160:1, Jan. 26, 2011, ECF No. 25.)

According to Ackman's file notes, Dentice told her that he "wanted to be treated like a new employee."  (DPFOF ¶ 27.)  Because Dentice was placed into a new position, he believed that he needed to be "sent to school."  (DPFOF ¶ 28.)  During the first week back to work, Dentice sat with an existing claim representative and upon her departure from Farmers at the end of the week, Dentice took over her file inventory.  (DPFOF ¶¶ 47-48.)   Farmers also arranged for one of its national

---

[4]  Dentice objects to the admission of his co-workers' statements on the basis of hearsay. However, pursuant to Fed. R. Evid. 801(d), a statement by a party opponent is not considered hearsay if it "was made by the party in an individual or representative capacity," or "is one the party manifested that it adopted or believed to be true."  Therefore, contrary to Dentice's arguments, his statements to his coworkers are admissible under Rule 801(d)(2).

8

trainers to come to the Milwaukee BCO during Dentice's second week back to work to spend one-on-one time with Dentice to help re-acclimate him to his position.  (DPFOF ¶ 49.)

On January 28, 2009, Ackman indicated that Dentice told her he did not know how to navigate the Customer Restoration Network ("CRN"), Farmers' main claim system.  According to Ackman, Dentice also stated that he had "memorization issues and can't remember how to work CRN and is seeing the doctor about that as well." (DPFOF ¶ 53, Def.'s Ex. 5, ECF No. 25.)  Ackman immediately contacted Goetz and Groby regarding Dentice's reported issues.  (DPFOF ¶ 54.)  Thereafter, operations personnel (Ackman, Golden, and Goetz) transferred Dentice's requests for accommodation to Farmers' human resources professionals (Groby and Lee-Stevens) for them to engage in the interactive process with Dentice.  (DPFOF ¶ 55.)  Dentice never had any further conversation with Ackman, Golden, or Goetz regarding his requests for accommodation at any time before Farmers terminated his employment.  (DPFOF ¶ 59.)

On January 28, 2009, Groby sent Dentice a letter telling him that Farmers needed additional information regarding his request for voice recognition software and the "memory loss" Dentice had reported to Ackman to further explore his requested accommodations.  (DPFOF ¶ 109.)  On January 30, 2009, Farmers received a prescription pad note from Dentice's treating physician, which stated that "[Dentice] has carpal tunnel and tendonitis in forearms. Recommend voice recognition transcription program for computer."  (DPFOF ¶ 110.)  On January 30, 2009, Groby emailed Lee-Stevens, asking whether such note was "acceptable," as he did not "see anything" in the note about whether Dentice could "perform the essential functions of his job without restrictions." (Pl.'s App. Ex. 99, ECF No. 56.)

On February 4, 2009, Dentice sent additional correspondence to Groby advising Farmers that he did not have memory loss and that he could perform the essential functions of his job given an

9

itemized set of accommodations. (DPFOF ¶ 112.) These accommodations included the following: (1) refresher training; (2) "[t]ouch base meetings with supervisor on the following schedule - for the first thirty days once a day, the next thirty days twice a week and once a week thereafter"; (3) detailed written work instructions; (4) that all corrective communication be verbal and written; (5) a quiet work area; (6) voice recognition software (Dentice also included a hyperlink to the software he requested); and (7) Greg Pausha as a direct supervisor "because he is in the office and he is familiar with the files I was given. This would also help me with the touch base meetings I am requesting as well." (Pl.'s Resp. to DPFOF ¶ 112.)

On February 6, 2009, Groby emailed Dentice, stating as follows:

I have received your Doctors note that reflects that Voice Recognition software is required due to your carpal tunnel. We are currently awaiting additional information from you per the ADAAA letter that was sent to you via email on 1/29/2009. Upon receipt of the requested information we will review and advise the status of your accommodation request(s). If you are unable to perform your work duties at this time without accommodation(s) please let me know ASAP so that we can address the situation.

(Def.'s App. Ex. 36, ECF No. 25.) On February 12, 2009, Dentice emailed Groby, stating that it "is difficult to perform my work duties at this time without accommodations." (Def.'s App. Ex. 37, ECF No. 25.) The next day, Groby responded to Dentice with directions for how to go about qualifying for a leave of absence, to which Dentice indicated that he was not requesting a leave of absence; rather, he had been working without his accommodations for two weeks and was waiting for Groby's response to Dentice's accommodation letter of February 4, 2009. (Def.'s App. Ex. 37, ECF No. 25.)

On February 16, 2009, Groby emailed Dentice, stating as follows:

[P]lease let me know ASAP if you are unable to perform your work duties as we process your accommodation request. In your email on 2/4/09 you stated that you were anticipating an additional letter from your psychiatrist, which I have not yet received. Please advise if you still anticipate my receipt of this letter.

10

> In the mean time, I will be working on your accommodation request based on the information that you have provided to date, which is limited to the note from Dr. Shaffer.

(Def.'s App. Ex. 37, ECF No. 25.) Groby also sent an email to Dentice on that same day wherein he indicated that he "just received a note from Dr. Deeken (psychiatrist) that was faxed to [him]. This note stated that a gradual resumption of duties was recommended, and was dated 2/2/2009. Please advise if there will be any additional documentation sent to me for the ADAAA interactive process." (Def.'s App. Ex. 38, ECF No. 25.)

By email dated February 24, 2009, Dentice indicated to Ackman and Groby the following: "I believe the lack of training since I got back from leave has slowed my timeliness to obtain all activities by their due dates." (PPFOF ¶ 226.)

On March 6, 2009, Lee-Stevens sent a letter to Dentice explaining that the first five of his requests for accommodation were reasonable. However, Lee-Stevens indicated that his request to change supervisors would not be met. Lee-Stevens concluded by stating as follows:

> Please consult with your physicians to provide more detailed information regarding your voice recognition software request. Specifically, please have your physician(s) explain whether or not you can perform the essential functions of a Liability Claims Representative with or without accommodation.

> In a similar fashion please have your physicians address the accommodation(s) that may, or may not be needed in relation to your anxiety, and memory loss; including an explanation of whether or not you can perform the essential functions of a Liability Claims Representative.

(Def.'s App. Ex. 39, ECF No. 25.)

At a meeting in early March 2009, Golden stated that the Milwaukee BCO scores were one of the lowest in the country. (Pl.'s Resp. to DPFOF ¶ 14.) Golden also testified that around that time, Dentice was their poorest performing employee. (Pl.'s Resp. to DPFOF ¶ 15.) On March 6, 2009, Groby emailed Golden with the following recommendation:

11

> I do not recommend placing Alex back on progressive discipline at this time since we do not have a recent history of performance deficiency to address. You told me yesterday that there have not been any audits completed on his work to date to give us objective results. At this time, we only have subjective information to base this memo on (I.E. he is requiring too much supervisor input for a CR of his experience).

(PPFOF ¶ 240.)

On March 9, 2006, Farmers placed Dentice back on corrective action following his initial six weeks at work and issued him a "Formal Counseling Memo-Performance." (DPFOF ¶ 69; Def.'s App. Ex. 18, ECF No. 25.) With respect to Dentice's performance, Ackman testified that she had to provide almost daily written direction and constant reminders regarding his performance expectations, and that she provided constant corrections on the majority of Dentice's claims. (DPFOF ¶ 61; Pl.'s Resp. to DPFOF ¶ 61.) Thus, at that time, Ackman advised Dentice that "as time goes on, it will be expected that your files will require less supervisor direction." (DPFOF ¶ 70.)

As of April 1, 2009, Dentice's TFQ audit score was 93.6%, indicating that Dentice was meeting expectations. (PPFOF ¶ 281.) Dentice's score at this time exceeded the scores of three other employees, ranking Dentice third highest in Wisconsin. (Pl.'s Resp. to DPFOF ¶ 15.) However, Farmers indicates that Dentice's TFQ scores would not have been meeting expectations without Ackman's continuous and on-going file assistance. (DPFOF ¶ 65.)

On April 1, 2009, Dentice again advised Farmers that he did not suffer from memory loss and alleged that "this interactive process is interfering with my successful return to work." (DPFOF ¶ 122.) On April 1, 2009, Groby sought advice from Lee-Stevens regarding how to proceed with Dentice, as Dentice "has not provided anything that I've requested." (Def.'s App. Ex. 40, ECF No. 25.) On April 3, 2009, Groby and Dentice had a conversation about Farmers' request for medical documentation. However, the parties dispute what transpired during this conversation. (DPFOF

12

¶ 125; Pl.'s Resp. to DPFOF ¶ 125.)  Later that same day, April 3, 2009, Groby emailed Dentice with

a "recap [of their] conversation."  Groby wrote, in pertinent part, as follows:

> You have brought to our attention that you have trouble typing due to carpal tunnel and tendonitis, and you have also informed us that anxiety, and memory loss has [a]ffected your ability to perform the essential duties of your job. . . .
>
> Because this information has been brought to our attention we need to have additional information from your physicians in order to determine if you are able to perform the essential functions of your job.  With that said your physician(s) need to tell us in writing whether or not you can perform your job with, or without accommodations (specifically related to carpal tunnel, tendonitis, anxiety, and memory loss).  If your physician(s) determine that you require accommodations we need them to explain how an accommodation would allow you to perform the essential functions of a Liability Claims Representative.

(Def.'s App. Ex. 41, ECF No. 25.)

> Dentice responded to Groby on April 5, 2009:
>
> Where did you get any information regarding memory loss, concerning me?  I never stated I had memory loss.  Your references to memory loss concerning my mental health are wrong and I believe the continued letters indicating the same are bordering on harassment toward me.  My doctor indicated what my problems are concerning my carpal tunnel and tendonitis in both wrists.  I believe he was clear and precise concerning my condition.  Since typing and use of a key board are included in my job, (which causes pain at times in both of my wrist[s])[.] I do not believe any additional information is needed or warranted from my medical doctor.  I explained to you, I have been doing my job, but I do have problems with pain in my wrists.  I explained to you I have been putting all my energies toward doing the best job I can possibl[y] do and do not want to waste any more energies with the interactive process.  This process is interfering with my goals toward successful employment with Farmers Insurance.

(Def.'s App. Ex. 42, ECF No. 25.)  According to Groby, he did not recall considering Dentice's

comment to be a complaint of harassment.  (DPFOF ¶ 130.)

According to Lee-Stevens, the voice recognition system Dentice requested was not provided

because Farmers "didn't get any specific information from the doctor."  (PPFOF ¶ 219.)

Ackman was in the Milwaukee BCO on Thursday, March 26 and Friday, March 27, 2009

because Profit Sharing Day, the day on which Farmers paid out bonuses to its employees, was to take

place on March 27. (DPFOF ¶¶ 73-74.) On March 27, Ackman emailed Dentice because he had not reported to the Branch Claims Office on either that Thursday or Friday asking: "Just wondering if you have had IPC's either yesterday or today as I haven't seen you in the office." (DPFOF ¶ 75.) Dentice responded that he had "met with Dale Kirstbraun and will be doing the [write-up] shortly." (DPFOF ¶ 76.) On April 1, 2009, Ackman determined that Dentice had "met with Dave on Weds 3/25, not Thursday or Friday, as addressed in my email," and reminded Dentice to "[m]ake sure you are in the office when you are not at IPCs." (DPFOF ¶ 77.) Also on April 1, 2009, Ackman emailed Golden her notes regarding Dentice's performance since his return to work. (DPFOF ¶ 78.) In that same email, Ackman informed Golden that "most recently . . . Alex responded that he wasn't in the office as he was at an IPC, which was not the case." (DPFOF ¶ 79.) Golden testified that he thereafter informed his manager, Goetz, of this incident. (DPFOF ¶ 80.)

On April 6, 2009, Ackman emailed Dentice again, asking him to provide her with a response of "where [he was] at on Thurs 3/26 and Friday morning 3/27." (DPFOF ¶ 83.) Dentice responded (and also carbon copied Groby) by stating that he "worked from home on 3/26/09 and the morning of 3/27/09." (Def.'s App. Ex. 23, ECF No. 25.) On April 7, 2009, Ackman forwarded Dentice's response to Golden. (DPFOF ¶ 85.) On April 7, 2009, Dentice met with Golden to discuss the email from Ackman about his work location on March 26 and 27. (PPFOF ¶ 315.) Dentice told Golden that he was in a hurry and thought Ackman was asking him about March 25th instead. (PPFOF ¶ 316.)

Also on April 6, 2009, Ackman sent Golden an email titled "Alex Audits." In this email, Ackman indicated that Dentice's current TFQ score was 93.6%, but without her involvement it would be 88.87%. (PPFOF ¶ 303; Pl.'s Ex. 153.)

On April 8, 2009, Goetz stated in an email to Lee-Stevens that "Dentice knowingly provided false information to his supervisor," "made a false representation that was later discovered," and that

he "considered this misconduct[] and grounds for immediate termination." (Def.'s App. Ex. 24, ECF No. 25.) Groby advised Golden that he did not agree with Dentice's termination because the requirement to work from the office "was informed verbally and was not documented." (Groby Dep. 57:17-58:2, Jan. 26, 2011, ECF No. 25.) However, Dentice was thereafter terminated.[5] According to Farmers, it terminated Dentice because he intentionally lied to Ackman about his whereabouts on March 26 and 27, 2009, and when Ackman confronted him on what was perceived as a lie, Dentice admitted that he had worked from home on those two days, in violation of Farmers' stated expectation that he work out of the office when not performing field work. (DPFOF ¶ 89.)

### III. SUMMARY JUDGMENT STANDARD

A district court shall grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by

---

[5] The parties dispute who from Farmers recommended that Dentice be terminated and who approved of Dentice's termination. (DPFOF ¶ 87; PPFOF ¶¶ 335-340.)

15

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). However, a mere scintilla of evidence in support of the nonmovant's position is insufficient. *See Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 255). "'[I]n the light most favorable' . . . 'simply means that summary judgment is not appropriate if the court must make a choice of inferences.'" *Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003) (quoting *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997)).

## IV. DISCUSSION

The ADA prohibits employers from discriminating against disabled employees because of their disability. 42 U.S.C. § 12112(a). Specifically, the ADA provides that it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Because the motivation and implementation behind the ADA was similar to that of the Civil Rights Act of 1964, courts often look to the Civil Rights Act for ADA guidance. *Dickerson v. Bd. of Trs.*, 657 F.3d 595, 600 (7th Cir. 2011) (citing *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 959 (7th Cir. 2010); *Casna v. City of*

16

*Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009); *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1128 (7th Cir. 2006)).

Dentice makes three interrelated arguments: (1) that he was discriminated against because of his actual disabilities (depression, general anxiety disorder, panic disorder, and carpal tunnel) and because of his perceived disability (memory loss); (2) that Farmers failed to accommodate his disabilities despite its agreement that the accommodations were reasonable and that it would provide them; and (3) that Farmers retaliated against him because he complained of retaliation and because he requested accommodations.

## A. Disability Discrimination

To establish disability discrimination, a plaintiff must establish that he (1) is disabled under the statutory definition, (2) is otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation, and (3) suffered an adverse employment action because of his disability. *Porch v. Potter*, 367 Fed. Appx. 669, 672 (7th Cir. 2010) (citing *Garg v. Potter*, 521 F.3d 731, 736 (7th Cir. 2008); *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005)). The first two requirements speak to whether a plaintiff can demonstrate he is protected by the ADA, i.e., that he is a "qualified individual with a disability." Once a plaintiff demonstrates that he is entitled to ADA coverage, he can then satisfy the third part of the test by showing, using the direct method or indirect *McDonnell Douglas* approach, that he suffered an adverse employment action because of his disability. *Timmons*, 469 F.3d at 1127.

*1. ADA Coverage*

To be covered by the ADA, a plaintiff must show that he is disabled within the meaning of the ADA and that he is qualified to perform the essential functions of the job with or without accommodation.

### a. Disability

Dentice argues that he is disabled under the ADAAA due to depression, anxiety, panic disorder, and carpal tunnel. One is disabled if he has a physical or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment. 42 U.S.C. § 12102(a); 29 C.F.R. § 1630.2(g); *see also Steffen v. Donahoe*, No. 11-2664, 2012 U.S. App. LEXIS 5849, at *11 (7th Cir. 2012). Major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working. 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(I).

A person is substantially limited in an activity if his impairment "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). Moreover, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.* Although not every impairment constitutes a disability within the meaning of the ADA, the term "'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 29 C.F.R. § 1630(j)(1)(i).

Dentice argues that his depression, general anxiety disorder, and panic disorder constitute physical and mental impairments that substantially limit major life functions, "including but not limited to, thinking, concentrating, learning, interacting and communicating with others, caring for

oneself, eating, sleeping, performing manual tasks, and marital relations." (Pl.'s Resp. Br. 6.)[6] Farmers does not dispute that Dentice suffers from these physical and psychological ailments. Rather, Farmers argues that his impairments do not rise to the level of a "disability," as defined by the ADA. Farmers notes that Dentice testified that his anxiety was initially brought on by stress from work and having a new supervisor, but that following his return to work, it did not impact his ability to interact with claimants or insureds. Farmers also notes that Dentice suffered from anxiety related to his carpal tunnel because he had to type so much to get his work done, but Dentice also indicated that he did not have "limited typing skills." (Def.'s Mem. 12.) According to Farmers, such "garden variety anxiety does not rise to the level of a disability as defined under the ADA." (Def.'s Mem. 12.)

Indeed, "[h]aving an impairment is not enough" to establish that one is disabled within the meaning of the ADA. *See Porch*, 367 Fed. Appx. at 672. Depending on its severity, depression may or may not constitute a disability. *See id*. (citing *Cassimy v. Bd. of Educ. of Rockford Public Schs.*, 461 F.3d 932, 963 (7th Cir. 2006)). The same can be said of anxiety—depending on its severity, anxiety may or may not constitute a disability. In the present case, Dentice was on a leave of absence from work for approximately nine months because of his generalized anxiety disorder, panic disorder, and diagnosed depression. Dentice received continued medical treatment for the symptoms he was experiencing as a result of these impairments, even continuing upon his return back to work in January 2009. Dentice has demonstrated that he was being treated for carpal tunnel during this same time. Moreover, Dentice has presented evidence that his impairments affected many facets of his life, including both his work and personal life. In light of the expansive scope of the definition of

---

[6] Dentice also argues that his Type II Diabetes "inarguably qualified as a disability and a record of a disability under the statute." (Pl.'s Resp. Br. 6.) However, Dentice never advised anyone at Farmers of this condition and never requested to be accommodated because of his diabetes. (DPFOF ¶ 98.) Accordingly, Dentice has presented no evidence that Farmers acted in contravention to the ADA, as amended, because of his diabetes.

19

"substantial limitation," and viewing the facts of this case in the light most favorable to Dentice, Dentice has presented a triable issue of material fact with respect to whether he is disabled under the ADA's statutory definition.

**b. Otherwise Qualified**

Farmers argues that Dentice was not otherwise qualified to perform the essential functions of his position with or without an accommodation. Dentice notes that, as of April 1, 2009, four TFQ audit scores revealed an overall score of 93.6%, which Dentice argues, meant that he was "exceeding expectations." (Pl.'s Resp. Br. 9.) Farmers indicates that without the substantial amount of file supervision, Dentice's TFQ scores would plummet to 88.7%. What is missing from the puzzle is why Dentice required such intensive file supervision. The record demonstrates that Farmers was in the process of re-vamping its auditing system, and also focusing on technology more so than it had in the past. Moreover, there is evidence in the record that Dentice's inability to meet Farmers' expectations was, at least in part, because his carpal tunnel affected his ability to type, which was a skill required for the job. Because Farmers never provided Dentice with the assistive device that would have allowed Dentice to record information without having to type, it is unknown whether such accommodation (assuming it to be reasonable) would have allowed Dentice to perform the essential functions of his job, i.e., to adequately complete his files without Ackman's claimed intensive supervision. Simply put, Dentice has put forth enough evidence for a jury to infer that he was qualified for his job.

Thus, the court finds that a reasonable jury could find that Dentice was protected by the ADA.

*2. Discrimination Based on Disability*

There is no question that Dentice suffered an adverse employment action, that being termination. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008) (finding

20

termination to be an adverse action). Thus, what Dentice must produce is some evidence suggesting that Farmers' decision to terminate him was based on his disability rather than some other job-related reason.

A disabled plaintiff can prove disability discrimination by using either the direct or indirect method of proof. *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2011). Under the direct method, a plaintiff can present either direct or circumstantial evidence to meet its burden. *Dickerson v. Bd. of Trs.*, 657 F.3d 595, 601 (7th Cir. 2011) (citing *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004); *Bekker v. Humana Health Plan Inc.*, 229 F.3d 662, 670 (7th Cir. 2000)). Direct evidence requires an admission by the decision maker that his or her actions were based upon the prohibited animus. *Dickerson*, 657 F.3d at 601. Circumstantial evidence, however, allows a jury to infer intentional discrimination. *Id.* Circumstantial evidence a plaintiff may produce to survive summary judgment includes the following: (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action. *Id.*

Under the indirect method of proof, or the *McDonnell Douglas* method of proving discrimination, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) he is disabled under the ADA; (2) he was meeting his employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably. *Id.* Once a plaintiff has established a *prima facie* case, the defendant must identify a legitimate, non-discriminatory reason for its employment decision. *Id.* (citing *Rooney v. Kock Air, LLC*, 410 F.3d 376, 381 (7th Cir. 2005)). If the defendant satisfies this

requirement, the plaintiff must then prove by a preponderance of the evidence that the defendant's reasons are pretextual. *Id.*

Here, there is no direct evidence of discrimination against Dentice—Farmers has not admitted it acted based on a prohibited animus. Without any direct evidence of discrimination, Dentice must present either circumstantial evidence of discrimination or he must first make out a prima facie case of discrimination under the indirect method of proof.

As the Seventh Circuit has recently indicated, the "line between circumstantial evidence under the direct method and indirect evidence of discrimination of retaliation under the burden-shifting approach has been blurred by the gradual integration of these methodologies." *Harper v. C.R. Eng. Inc.*, No. 11-2975, 2012 U.S. App. LEXIS 11598, at *40 (7th Cir. June 8, 2012). Applying these broad, and now overlapping approaches, the court will analyze whether Dentice has presented a sufficient basis for sustaining a jury verdict in his favor.

To that end, Dentice argues that "there is a long chain of discriminatory treatment that began after Mr. Dentice began utilizing medical leave and continued through his termination." (Pl.'s Resp. Br. 10.) Dentice argues that Farmers' discriminatory treatment is evidenced by the following: (1) Ackman, Golden, and Goetz believed that Dentice's leave of absence was suspect and that he may sue Farmers; (2) in July 2008, Golden attempted to terminate Dentice while Dentice was on short-term disability and was warned by Groby not to discriminate against Dentice; (3) upon his return to work, Farmers believed Dentice would sue the company because of his medical leave and papered his file; (4) Golden disciplined him on March 9, 2009 even though Groby warned him that it was without basis and was "punitive"; (5) only Dentice was required to work out of the office because of performance; (6) on April 6, 2009, Ackman lowered Dentice's TFQ audit score based on allegedly requiring "too much supervisor involvement" but did not lower the scores for other non-disabled employees; (7) Lee-

22

Stevens approved his termination without any investigation; and (8) Groby weeded out and shredded some of his personnel records post termination. (Pl.'s Resp. Br. 10-16.)

Farmers argues that Dentice's performance was unsatisfactory and that he was not meeting its legitimate employment expectations. For a valid discrimination claim under the ADA, an employee must show that he was meeting his employer's legitimate employment expectations and that he was performing his job satisfactorily. *Dickerson*, 657 F.3d at 602. Because this analysis is inextricably intertwined with the pretext analysis, the court will address both issues together in its discussion of pretext. *See Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 644 (7th Cir. 2006) (noting that a court may analyze prima facie elements together with pretext where the issues overlap substantially).

What Dentice does not spend much time arguing is that he was treated less favorably than a nondisabled, similarly situated person. However, sometimes a plaintiff cannot identify similarly situated employees. *Timmons*, 469 F.3d at 1126. "To account for such circumstances, we have said that the fourth prong (and, actually the test as a whole) really requires a showing 'that the circumstances surrounding the adverse action indicate that it is more likely than not that his disability was the reason for it.'" *Id.* Assuming that Dentice is disabled and assuming that Dentice is a qualified individual with a disability under the ADA (both of which are disputed), the court concludes that a reasonable jury could find such to be the case. In other words, Dentice has presented evidence from which a jury could reasonably infer that Dentice's disability (disputed) was more likely than not the reason for his termination.

Dentice presented evidence that, shortly after his leave of absence through his termination, the threat of his termination loomed. While he was put on progressive discipline the day he commenced leave, he had not yet reached the point of termination. Then, in July of 2008, Golden raised the issue

of Dentice's termination via a "work force reduction." Goetz testified that it was "possible" that Golden wanted to fire Dentice in July of 2008. On July 30, 2008, Groby sent Golden an email indicating that Dentice's short term disability was approved through August 15, 2008 and that if he exhausts all of his sick time but is still cleared for a leave of absence, he would go on unpaid leave of absence. Groby also stated that "simply because Alex's FMLA job protection (12 weeks) expired on 7/21 does not make him an automatic candidate for termination." (Pl.'s Ex. 51, ECF No. 55.) Groby concluded his email as follows:

> If you still wish to downsize your operation by 1 position we will need to complete a workforce reduction matrix in order to determine the person/position that will be downsized from your operation. The matrix is based on multiple criteria to ensure there is no form of discrimination taking place.

(Pl.'s Ex. 51, ECF No. 55.) The completion of the matrix revealed that another employee, Roni Winchell, would be terminated, rather than Dentice. Thereafter, it does not appear that Farmers terminated any employee based on the results of the matrix.

Further, on or about March 5, 2009, Golden emailed Groby a proposed "Formal Counseling Memo - Performance" that he had intended to issue to Dentice. Golden's intent was to place Dentice back on Formal Counseling after his six weeks of retraining. (Pl.'s Ex. 128, ECF No. 56.) Groby responded, indicating that he did *not* recommend placing Dentice back on Progressive Discipline because Farmers did not have a recent history of performance deficiencies to address being that there had not been any audits completed on his work to date "to give [Farmers] objective results." (Pl.'s Ex. 128; ECF No. 56). Because Farmers had only subjective information to base this memo upon, such memo could be viewed as "punitive without solid data to support it." (Pl.'s Ex. 128; ECF No. 56.) However, Farmers issued an almost exact copy of this memo to Dentice just four days later, on March 9, 2009.

Additionally, Ackman's response to the March 26 and 27, 2009 incident was inconsistent with what ultimately culminated in Dentice's termination. Ackman's first reaction was to tell Dentice that he must work from the office. However, on April 6, 2009, Ackman lowered Dentice's TFQ scores, based upon exactly what documentation is not precisely clear, and emailed this information to Golden. On the next day, April 7, 2009, Ackman forwarded by email to Golden a proposed Formal Warning memo for Dentice to advance him in the next step in the progressive discipline policy due to "behavior and performance deficiencies." (PPFOF ¶ 324.) It appears that Dentice never received that memorandum. Instead, Golden testified that he decided to terminate Dentice's employment because of his misconduct and communications with Ackman. (Def.'s Resp. to PPFOF ¶ 330.) Dentice was thereafter terminated, against Groby's advice that Farmers should not terminate Dentice because the requirement to work from the office was not in writing.

Finally, Dentice has presented evidence indicating that Farmers misconstrued his reported memorization issue and met his request for a voice activated software device with immediate skepticism. Dentice reported to Ackman that he had "memorization issues" relating to CRN, but having memorization issues is wholly different than having memory loss. Dentice presented evidence that even after he informed Farmers that he did not have memory loss, Farmers repeatedly asked him to obtain more information from a medical provider about his memory loss, indicating that Farmers may have jumped to conclusions too early and perceived Dentice's memorization issue to be a more significant issue than initially reported. Additionally, as will be discussed below, Dentice's professional medical opinions that his typing was affected both by his carpal tunnel and by stress stemming from his inability to type undermine Farmers' claim that it was unaware of how a voice activated software program could benefit Dentice.

Despite this evidence, Farmers argues that Dentice was not meeting its legitimate expectations or performing his job satisfactorily. Its argument falls into two categories: (1) Dentice required too much file supervision; and (2) Dentice lied to his supervisor regarding his whereabouts on March 26 and 27, 2009. More specifically, without the ongoing file assistance from Ackman, Dentice could not have performed at the level necessary to maintain his employment with Farmers. And because the ADA does not require the level of assistance Dentice sought, Dentice was unable to perform the essential functions of his position. Moreover, Farmers argues that Dentice could not perform the essential functions of his job because "lying to one's supervisor is not meeting an employer's legitimate job performance standards." (Def.'s Mem. 13.) In sum, according to Farmers, Dentice's "job performance" was "unacceptable." (Def.'s Mem. 13.)

Dentice argues that Farmers' reasons for terminating his employment were pretextual. In determining whether an employer's stated reason is pretextual, "[t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). To meet this burden, Dentice "must identify such weaknesses, implausibilities, inconsistencies, or contradictions" in Farmers' proffered reason "that a reasonable person could find [it] unworthy of credence." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007). However, if Farmers honestly believed the reason it gave, Dentice loses even if the reasons were foolish, trivial, or baseless. *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992).

I turn first to Farmers' argument that Dentice required too much file supervision. For starters, there is no evidence indicating how much time Ackman spent going over Dentice's work, how this amount of time compared with the time Ackman spent reviewing and revising other claim representatives' work, and what the parties considered an acceptable amount of supervision. Further,

it is unknown whether any accommodations, namely, the voice activated transcription software, would have enabled Dentice to complete his files adequately and timely. Thus, Farmers' claim that Dentice's performance was unsatisfactory because of Ackman's extensive supervision does not entitle it to summary judgment on Dentice's discrimination claim.

Despite the uncertainty regarding whether any accommodations could have enabled Dentice to adequately prepare his files, Farmers argues that Dentice lied to his supervisor and thereby performed his job unsatisfactorily. In light of the accommodations that Dentice claimed were necessary to ensure his future success with Farmers, Dentice does not argue that any expectation to work from the office when not on an IPC or doing field work (at least temporarily) was an illegitimate one.

However, Dentice claims that Farmers never informed him of this requirement until March 27, 2009. There is no question that this requirement was not in writing. According to Farmers, on January 26, 2009, Ackman told Dentice that he had to work from the office, and her "work from the office" warning on March 27, 2009 was simply a reminder of her previous conversation with Dentice. On the other hand, Dentice states that Ackman first told him that he was expected to work out of the office on March 27, 2009. (DPFOF ¶ 269.)

Farmers relies on three pieces of evidence to bolster its argument that Ackman told Dentice he must work from the office in January 2009. First, Ackman's file notes regarding Dentice reflect that, on January 26, 2009, Ackman told Dentice that he was "expected to work out of the Milwaukee BCO all the time except for field work, IPC, [and] investigations," so "this way he will have access to local management." (Def.'s App. Ex. 5, ECF No. 25.) Second, the diagram of the Milwaukee Branch Claims Office that Dentice introduced during the deposition of Golden corroborates Golden's testimony that he saw Dentice sit in the same location each day, as evidenced by the "A.D." noted on

that diagram. And finally, Farmers indicates that two of Dentice's co-workers stated that, upon his return to work, Dentice admitted to both of them that he was to perform his job duties from the Milwaukee Branch Claims Office when not doing IPCs or field work.

To be sure, Farmers' evidence corroborates Farmers' having told Dentice to work from the office except when doing field work, IPCs, and investigations. While the single page diagram with the initials "A.D." is not particularly persuasive evidence (it is not signed, dated, or much less created for each day Dentice was in the office), Ackman's notes strongly evidence Farmers' claim that Ackman informed Dentice of this requirement. Further, Dentice's admissions to two coworkers that he was told to work from the office when not on IPCs strongly indicate that Dentice, contrary to his now stated belief, was informed of the requirement to work from the office. These same two coworkers also declared that they routinely saw Dentice in the office performing his job duties.

Dentice, in support of his claim that Farmers never told him he had to work from the office when not on IPCs, relies upon only his uncorroborated testimony. That being said, the Seventh Circuit has stated as follows: "It is worth pointing out here that we long ago buried—or at least tried to bury—the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (citing *Payne v. Pauly*, 337 F.3d 767, 770-73 (7th Cir. 2003)). "If based on personal knowledge or firsthand experience, such testimony can be evidence of disputed material facts." *Id.* Dentice's claim that he was never informed of this "work from the office" requirement is certainly based on personal knowledge and firsthand experience. Accordingly, the evidence, construed in favor of Dentice, the non-movant, reveals an issue of material fact with regard to whether Dentice was actually informed of Farmers' "work from the office" expectation.

The court is mindful of the general proposition that whether an employee is meeting his employer's legitimate expectations is assessed by looking at the employee's job performance through the eyes of his supervisor at the time of his termination. *See Harper v. C.R. Eng., Inc.*, No. 11-2975, 2012 U.S. App. LEXIS 11598, at *31 (7th Cir. June 8, 2012). Farmers argues that it in good faith believed that Ackman communicated its expectation that Dentice work from the office, and therefore, it had a good faith belief that Dentice disobeyed this instruction and then lied about it. However, it is illogical to find that an employee is not meeting his employer's legitimate expectation if he was unaware of that expectation. Further, Farmers agreed to provide all instructions to Dentice in writing, and it is undisputed that this "work-from-the-office instruction" was never provided to Dentice in writing. Had Farmers done what it told Dentice it would do, Dentice would have been certain of what was expected of him, particularly in light of Dentice's ability to work from home for his previous twenty-six years of employment with Farmers.[7]

Accordingly, based on the evidence of record, Dentice has put forth enough evidence from which a jury reasonably could conclude that Farmers' asserted reason for its actions was pretextual.

Simply stated, Dentice has presented evidence that, shortly after he took a medical leave of absence, Farmers took steps to terminate his position. Dentice has presented evidence that would permit the inference that Farmers acted against him based on his disability. Dentice has shown suspicious circumstances surrounding his termination, allowing an inference that it is more likely than not that Farmers terminated him because of his disability. Accordingly, Farmers' motion for summary judgment on Dentice's discrimination claim will be denied.

---

[7] Moreover, there appears to be confusion about whether this work-from-the-office expectation was in effect permanently or for only a brief period of time.

**B. Failure to Accommodate**

I now turn to Dentice's failure to accommodate claim. To establish his failure to accommodate claim under the ADA, Dentice must show that (1) he is a qualified individual with a disability; (2) the defendant was aware of his disability; and (3) the defendant failed to reasonably accommodate his disability. *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 678 (7th Cir. 2010); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). The ADA requires an employer to "mak[e] reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual." *Gratzl*, 601 F.3d at 682 (citing 42 U.S.C. § 12112(b)(5)(A)). "'An employer is not obligated to provide an employee the accommodation [s]he requests or prefers, the employer need only provide some reasonable accommodation.'" *Id.* at 681-82 (quoting *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 546 (7th Cir. 2008)).

As previously discussed, Dentice presented enough evidence to demonstrate an issue of material fact regarding whether he was a qualified individual with a disability. With respect to the second element of a failure to accommodate claim, the email exchanges and correspondence between Dentice and Farmers' representatives demonstrate that Farmers was aware that Dentice suffered from anxiety, depression, and carpal tunnel.

Thus, the critical issue is whether Dentice presented evidence that Farmers failed to reasonably accommodate him. To establish this element, Dentice must have presented evidence showing not only his attempt to engage in an interactive communication process with the company to determine a reasonable accommodation, but also that Farmers was responsible for any breakdown that occurred in that process. *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). When there is a communication breakdown, the court is required "'to isolate the cause of the breakdown and then

assign responsibility.'" *Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009) (quoting *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996)).

According to Farmers, it was engaging in the interactive process. It was Dentice, not Farmers, that caused the breakdown of communication because it repeatedly requested that Dentice gather information from his medical providers, and he failed to honor those requests. As the Seventh Circuit recognized, "[a]n employee's request for reasonable accommodation requires a great deal of communication between the employee and employer." *Id.* An employer "may not be obligated to provide a specifically requested modest accommodation unless the employer is made aware of its medical necessity to the employee." *Id.* Thus, a reasonable accommodation "is connected to what the employer knows about the employee's precise limitations," and what an employer knows is limited by the evidence the employer receives. *Id.*

Dentice's failure to accommodate claim is three-fold: (1) Farmers failed to determine if it could provide a voice activated software for his carpal tunnel and anxiety; (2) Farmers agreed to provide reasonable accommodations for his anxiety and depression, but failed to implement them; and (3) Farmers refused to acknowledge that he did not have "memory loss."

I first turn to Dentice's request for a voice activated software program. On January 17, 2009, Dentice communicated to Farmers his need for a voice activated software program. On or about that same date, Farmers received a letter from Dr. Riegert indicating that the voice activated typing program would alleviate the anxiety Dentice experienced relating to his "limited typing skills." Shortly thereafter, Farmers received a note from Dentice's treating physician, Dr. Shaffer, indicating that a voice recognition transcription program would accommodate Dentice's carpal tunnel and tendonitis. Farmers' first indication to Dentice that it needed more information to process his request was on January 28, 2009, when Groby sent Dentice a letter telling him that it "needed additional

information regarding . . . his request for voice recognition software." (DPFOF ¶ 109.) The court is uncertain what "additional information" Farmers requested because the January 28, 2009 letter is not correctly cited and the court is unable to locate it within the record. As of February 6, 2009, Farmers indicated that it was still waiting for the additional information from Dentice, after the receipt of which it would review and advise him regarding the status of his case. On February 16, 2009, Groby indicated that he was waiting for a letter from Dentice's psychiatrist, and that he would work on Dentice's accommodation request based on the information he had to date, i.e., Dr. Shaffer's note.

Despite Farmers' indication that it would work on Dentice's requested accommodation with the information it received, on March 6, 2009, Lee-Stevens specifically asked Dentice to have his physician (1) explain whether he could perform his job with or without an accommodation and (2) address the accommodations that may be needed because of his anxiety and memory loss. By April 1, 2009, Dentice repeated once again that he did not have memory loss and that the interactive process was interfering with his return to work. Farmers' last request for information came on April 3, 2009, when Groby asked Dentice to have his physician indicate whether he could perform his work, with or without accommodations, and if an accommodation was needed, how that accommodation would allow Dentice to perform his job.

It is undisputed that Dentice provided Farmers with information regarding his carpal tunnel and tendonitis. Dentice also provided Farmers, based upon his doctors' recommendation, a request for a voice activated software system as an accommodation. It is equally clear that Dentice did not provide the information that Farmers requested he provide. According to Dentice, he did not think that the interactive process required any more information of him. He provided two professional opinions, one from Mr. Riegert and one from Dr. Shaffer, indicating that a voice activated typing program would be beneficial to him because it would alleviate his symptoms associated with his

32

carpal tunnel and tendonitis as well as his anxiety that stems from his inability to type without pain. These opinions convey to Farmers that Dentice was able to perform his job with an accommodation. Whether he could perform his job without this accommodation is not so clear. However, this does not matter for purposes of Dentice's failure-to-accommodate claim. Whether Dentice could perform his job without the requested accommodation is not an element that he must prove. He must show only that he is qualified to perform the job, *with or without*, an accommodation. Moreover, in his February 4, 2009 request for accommodations, Dentice provided a hyperlink to the software he requested, which provided an explanation of the software. Thus, Farmers' claim that it did not know what a voice activated software program was or how it could accommodate Dentice is not persuasive. For these reasons, a reasonable jury could find that Dentice was not responsible for any breakdown of communication that occurred in the interactive process.

Furthermore, an employer is obligated to provide the necessary accommodation unless it "would impose an undue hardship" on the operation of its business. 42 U.S.C. § 12112(b)(5)(A). Farmers makes no argument that providing Dentice with a voice activated typing device would unduly burden its operation, and the court will therefore not undergo this analysis.[8]

Accordingly, an issue of material fact exists with regard to whether Farmers failed to reasonably accommodate Dentice, and summary judgment on Dentice's failure-to-accommodate claim will be denied.

## C. Retaliation

The ADA prohibits employers from retaliating against employees who assert their right under the act to be free from discrimination. 42 U.S.C. § 12203(a). Employers are forbidden from

---

[8] The court finds it unnecessary to address the other ways in which Dentice argues Farmers failed to accommodate him.

Case 2:10-cv-00113-WEC   Filed 06/28/12   Page 33 of 36   Document 68

retaliating against employees who raise ADA claims regardless of whether the initial claims of discrimination are meritless. *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007). To establish a case of retaliation under the direct method of proof, a plaintiff must establish, either by way of direct or circumstantial evidence, that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the two events. *Dickerson*, 657 F.3d 595, 601; *Porch v. Potter*, No. 08-3900, 2010 U.S. App. LEXIS 3607, at *11 (7th Cir. Feb. 10, 2010) (citing *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006)). A plaintiff can also elect to use the indirect, burden-shifting method for retaliation claims, under which the plaintiff must demonstrate that he (1) engaged in protected activity; (2) was performing his job satisfactorily; and (3) was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer. *Dickerson*, 657 F.3d at 601-02. Once a plaintiff satisfies his initial burden, the burden then shifts to the defendant to present a noninvidious reason for the adverse employment action. If the defendant meets this burden the plaintiff must then demonstrate that the defendant's proffered reason was pretextual. *Id.* at 602.[9]

Dentice argues that his ongoing requests for accommodations constitute statutorily protected activity. (Compl. ¶ 30.) Dentice cites no authority for the proposition that a mere request for a reasonable accommodation without any mention of discriminatory conduct constitutes statutorily protected activity. *See Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001) (the Seventh Circuit has not ruled on the issue of whether informal complaints of discrimination constitute protected expression); *but see Dillard v. Chi. Transit Auth.*, 105 Fed. Appx. 107, 111 (7th Cir. 2004) ("informal oral complaints do not constitute protected expression where an employer maintains a

---

[9] Dentice has proceeded under the direct method of proof. Accordingly, the court will refrain from discussing whether he has presented a triable issue of fact under the indirect, burden-shifting method.

formal process for employees to communicate claims of discrimination"). Nevertheless, "a claim for retaliation is preceded by an obligatory complaint about discriminatory conduct, so that the employer is aware of the mistreatment and the corresponding protected activity." *Durken v. City of Chi.*, 341 F.3d 606, 614 (7th Cir. 2003). Dentice's various requests for accommodations cannot be construed as discrimination.

However, in the interest of completeness, even if this court were to assume that Dentice's repeated requests for a reasonable accommodation constituted protected activity, his requests are simply too remote in time to support a reasonable inference of retaliation. The mere temporal proximity between the protected activity and the adverse action will rarely be sufficient to create a triable issue. *See Harper v. C.R. Eng., Inc.*, No. 11-2975, 2012 U.S. App. LEXIS 11598, at * 22 (7th Cir. June 8, 2012) (citing *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)). Dentice requested accommodations in January 2009 and was not terminated until April 2009. In addition to the evidence of suspicious timing, Dentice offers the following circumstantial evidence: Ackman began papering his file, Golden imposed "punitive discipline," and Farmers failed to provide reasonable accommodations. None of these actions, however, present particularly compelling evidence of discriminatory intent related to his requests for accommodation.

Dentice also argues that his April 5, 2009 email to Groby wherein he claimed that Farmers' letters referring to "memory loss" were "bordering on harassment" also constitutes protected activity. (Compl. ¶ 30.) According to Dentice, "[g]iven that Goetz and Groby's offices are only 50 feet apart in the same building, and both Goetz and Groby were heavily involved in Mr. Dentice's situation, it is likely they discussed Mr. Dentice's complaint." (Pl.'s Resp. Br. 29.) Farmers disputes this argument because neither Groby nor Lee-Stevens interpreted his email as a complaint of discrimination.

Even if the court construed Dentice's email to be protected activity, his retaliation claim based on such complaint fails. The record indicates that either Goetz or Golden or both made the decision to terminate Dentice. There is no evidence in the record to suggest that their decision to fire Dentice was influenced by Groby or Lee-Stevens, the recipients of Dentice's April 5th email. *See Davenport v. Northrop Grumman*, 281 Fed. Appx. 585, 587 (7th Cir. 2008); *Luckie v. Ameritech*, 389 F.3d 708, 715 (7th Cir. 2004). The court's "favor toward the nonmoving party does not extend to drawing '[i]nferences that are supported by only speculation or conjecture.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008). Dentice's argument that Goetz and Groby *likely* discussed his complaint does not rise above the speculation or conjecture level, and is therefore, insufficient to present a triable issue.

Accordingly, Farmers' motion for summary judgment with respect to Dentice's retaliation claim will be granted.

**NOW THEREFORE IT IS ORDERED** that the defendant's summary judgment motion be and hereby is **GRANTED IN PART** and **DENIED IN PART**;

**IT IS FURTHER ORDERED** that on July 16, 2012 at 10:00 a.m. in Courtroom 242, U.S. Courthouse, 517 East Wisconsin Avenue, Milwaukee, Wisconsin 53202, the court will conduct a conference with the parties to discuss the further processing of this case to final resolution and judgment.

**SO ORDERED** this 28th day of June 2012 at Milwaukee, Wisconsin.

**BY THE COURT:**

s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge